SKAPIK LAW GROUP
Mark J. Skapik (SBN 164957)
Geralyn L. Skapik (SBN 145055)
Blair J. Berkley (SBN 222293)
Matthew T. Falkenstein (SBN 333302)
5861 Pine Avenue, Suite A-1
Chino Hills, California 91709
Telephone:   (909) 398-4404
Facsimile:   (909) 398-1883
mskapik@skapiklaw.com,
gskapik@skapiklaw.com,
bberkley@skapiklaw.com,
mfalkenstein@skapiklaw.com

SOUTHERN CALIFORNIA LAWYERS GROUP
Eric Christopher Morris (SBN 243425)
5861 Pine Ave. Suite A-1
Chino Hills, Ca 91709
(909) 398-4404
eric.c.morris@gmail.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY AARON MCFADDEN, an individual,<br><br>                    Plaintiff,<br><br>        vs.<br><br>CITY OF BAKERSFIELD, a municipal corporation; Senior Officer T. SCHLEICHER, an individual; Sergeant SIMS, an individual; Officer BLANKENSHIP, an individual; Officer ANDREW CELEDON, an individual; Officer DOYLE, an individual; Officer KNIFFEN, an individual; Senior Officer SKIDMORE, an individual; and DOES 1 through 20, inclusive,<br><br>                    Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1. 42 U.S.C. § 1983 (Unreasonable seizure; excessive force)<br>2. 42 U.S.C. § 1983 (Failure to intercede)<br>3. 42 U.S.C. § 1983 (Monell)<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jeffrey Aaron McFadden ("Plaintiff") alleges as follows:

**PARTIES**

1.      Plaintiff is an individual and resident of Bakersfield, California.

2.      Defendant CITY OF BAKERSFIELD ("CITY") is a municipal corporation duly chartered under California Constitution Article XI, section 3.

3.      Defendant T. Schleicher ("SCHLEICHER") is an individual and Senior Police Officer in the CITY Police Department.  Plaintiff is informed and believes that SCHLEICHER is a resident of Kern County.

4.      Defendant Sergeant Sims ("SIMS") is an individual and Sergeant in the CITY Police Department.  Plaintiff is informed and believes that SIMS is a resident of Kern County.

5.      Defendant C. Blankenship ("BLANKENSHIP") is an individual and Officer in the CITY Police Department.  Plaintiff is informed and believes that BLANKENSHIP is a resident of Kern County.

6.      Defendant Andrew Celedon ("CELEDON") is an individual and Officer in the CITY Police Department.  Plaintiff is informed and believes that CELEDON is a resident of Kern County.

7.      Defendant Doyle ("DOYLE") is an individual and Senior Officer in the CITY Police Department.  Plaintiff is informed and believes that DOYLE is a resident of Kern County.

8.      Defendant Kniffen ("KNIFFEN") is an individual and Officer in the CITY Police Department.  Plaintiff is informed and believes that KNIFFEN is a resident of Kern County.

9.      Defendant Skidmore ("SKIDMORE") is an individual and Senior Officer in the CITY Police Department.  Plaintiff is informed and believes that SKIDMORE is a resident of Kern County.

10.      Defendants SCHLEICHER, SIMS, BLANKENSHIP, CELEDON, DOYLE, KNIFFEN, and SKIDMORE are sued in their individual capacities.

11. The true names of Defendants DOE 1 through 20 are unknown to Plaintiff who, therefore, sues these Defendants by such fictitious names. When the true names of these Defendants are ascertained, Plaintiff will amend this Complaint to allege their true names.

## JURISDICTION AND VENUE

12. This Court has original jurisdiction over Plaintiff's 42 U.S.C. section 1983 claims pursuant to 28 U.S.C. sections 1331 and 1343.

## GENERAL ALLEGATIONS

13. In 2002, Plaintiff was stopped by the Santa Barbara Police Department during Old Spanish Days Fiesta for a traffic stop and ended up receiving a vicious beating. Since that incident, Plaintiff has been terrified of police officers.

14. On October 8, 2021, Plaintiff lived at 517 Miller Street ("Residence"). At that address, there is a single-family home and a three-unit apartment building. The apartment building is parallel to the south side of the single-family home and both buildings face Miller Street to the west. All the space between Miller Street and the single-family home and the apartment building is covered in concrete for vehicle parking.

15. Plaintiff lived in Apartment A, which is at the west end of the apartment building. Apartment A has a south-facing door near the west end of the apartment building. The south-facing door is protected by a security (screen) door.

16. A chain-link fence runs parallel to the south side of the apartment building, about four feet south of the apartment building. A chain-link-fence gate parallel to the west end of the apartment building prevents immediate access to south-facing door of Apartment A and the walkway along the south side of the apartment building.

17. On October 8, 2021, at approximately 12:56 p.m., Kern County Probation Officer E. Meyer and his unit (including Probation Officer Martinez) sought to serve Plaintiff a probation-violation warrant at his Residence and banged on the south-facing door.

18. At that time, Plaintiff was entering the shower with his bathroom fan running. He heard someone banging on the door, but decided not to answer it because no one knew he was home.

19. Officer Meyer knew Plaintiff well and knew that Plaintiff suffered mental-health issues as a consequence of his prior contacts with Plaintiff.

20. At 1:25 p.m., Officer Meyer requested that additional Kern County probation officers respond to the Residence.

21. Additional probation officers, including Rodolfo Rivera ("Rivera"), arrived at or about 1:30 p.m. and prepared to enter the Residence.

22. The probation officers or the Bakersfield Fire Department broke the lock on the security door protecting the south-facing door.

23. Plaintiff heard someone breaking his security door and believed that local gangsters were invading his home. Plaintiff was scared and screamed something like, "You guys are crazy! How do you know that I have no weapon?"

24. The probation officers ceased their banging on the door and retreated.

25. Plaintiff's first reaction was to close the security door. (The probation officers broke the lock on the security door.)

26. Plaintiff had no firearms in the apartment and the probation officers never saw Plaintiff holding anything that looked like a firearm.

27. The apartment windows have security bars and mesh screens. On the inside, the windows had blackout blinds. Hence, it was impossible for anyone to see through the windows.

28. Plaintiff first realized that it must have been probation officers pounding on his door when he looked outside and saw multiple officers.

29. Plaintiff talked to Officer Meyer on the telephone and told him that he was off his mental-health medications and did not feel well.

30.     Officer Meyer told Plaintiff that he had better come out or else the Bakersfield Police Department would be called and, "You know the police officers have heavy hands.  You are going to get shot."

31.     When Plaintiff did not come outside, the probation officers called for assistance from the CITY Police Department.

32.     Between 1:30 and 2:30 p.m., numerous Bakersfield Police officers arrived to the Residence, and Plaintiff became increasingly alarmed and stressed.  The number of probation and police officers assembling outside the Residence seemed to far exceed legitimate needs.

33.     Plaintiff made numerous unsuccessful attempts to telephone his wife, his father, and his daughter while his cell-phone battery was running down.  He wanted to talk to his wife before he surrendered.  She works at Hoffmann Hospice.

34.     Plaintiff installed a security camera (with loudspeaker) on the apartment roof near the south-facing door.  With a cell-telephone application, he was able to rotate the security camera, see the officers assembling outside, and talk through the loudspeaker on the camera.

35.     However, when the CITY police officers arrived, they turned off the electric power to Plaintiff's apartment.  This disabled Plaintiff's security camera and made it impossible for him to see what was going on outside and to communicate through the loudspeaker.

36.     All police officers in the State of California are required to be Peace Officer Standards and Training ("P.O.S.T.") certified.  Training for dealing with mentally-ill individuals is mandatory and covered in P.O.S.T. Learning Domain 37 ("LD 37").  P.O.S.T. LD 37 instructs police officers: "Do not threaten the individual with arrest or in any other manner" because "[t]hreats may create additional fright, stress, or potential aggression."  LD 37 (p. 4-16).

COMPLAINT

37.     With no lights on inside, and blackout blinds on the windows, Plaintiff needed his lantern/spotlight (with pistol grip) to see around his apartment. Plaintiff searched for his portable cell-phone battery recharger and began to get frantic.

38.     Plaintiff is informed and believes that Probation Officers Meyer and Martinez told all of the arriving CITY police officers that Plaintiff suffered from mental-health issues, was off his medications, and was not feeling well.

39.     The CITY Police Department Crisis Negotiation Team ("CNT") arrived on the scene and set up operations in a trailer.  A female negotiator talked to Plaintiff on the cell phone.  Plaintiff told the CNT that he was off his mental-health medications and was not feeling well.

40.     At approximately 2:18 p.m., Officer Kevin Shipton arrived with a Bearcat armored vehicle.  Shipton drove the Bearcat right up to within four or five feet of Apartment A.

41.     At approximately 3:34 p.m., the CITY Special Weapons and Tactics (SWAT) team arrived.

42.     The deployment of an armored vehicle and the SWAT team was completely disproportionate to the circumstances because Plaintiff had made no verbal threats, fired no shots, pointed no weapons at officers, and held only his phone or lantern/spotlight in his hands.

43.     Plaintiff told Probation Officer Meyer on the cell telephone that he was suffering from a mental-health crisis and was afraid to come outside.

44.     Senior Officer Defendant SCHLEICHER arrived with his K-9.

45.     Defendant Sergeant SIMS arrived to take command of the assembled officers.

46.     With the arrival of SCHLEICHER and SIMS, there were approximately 66 probation and police officers at Plaintiff's Residence.

47.     The female CNT negotiator repeatedly told Plaintiff, "I want you to come out."  She asked how many people Plaintiff had in the apartment.  The negotiator,

however, seemed to be maintaining multiple simultaneous telephone calls, did not appear to be listening to Plaintiff, and made no reasonable attempt to organize a peaceful surrender.  It seemed to Plaintiff as though she was attempting to stall until the CITY was able to set up all of its tactical gear.

48.    Someone else broadcast numerous repetitive statements over a loudspeaker mounted on the Bearcat ("Come out with your hands up."), alternating with siren and honking-siren sounds.  This served to heighten Plaintiff's stress level.

49.    In addition to the Bearcat armored vehicle, the K-9, and 66 police officers, the CITY ultimately delivered drone aircraft and a bomb-squad robot to the Residence.

50.    The robot was driven through the now-broken chain-link-fence gate, past the south-facing door, to a position a few feet east of the south-facing door.  The robot scared Plaintiff because he did not know whether it was going to shoot him or not.

51.    Plaintiff got confused as he tried to listen to the loud speaker outside and the female CNT negotiator on his cell phone, while the police officers outside turned sirens on and off, while he repeatedly attempted to reach his wife via cell phone, and while he searched for his portable cell-phone charger in the darkness of his apartment.

52.    Plaintiff was unable to reach his wife before his cell-phone battery died.  She was at work and apparently unable to answer.

53.    Plaintiff was never able to talk to someone with apparent mental-health or crisis-negotiation skills.  A reasonable officer would have realized that Plaintiff was intimidated and frightened by the 66 officers, SWAT team, Bearcat armored vehicle, bomb-squad robot, and drones flying overhead.

54.    Plaintiff repeatedly looked out through the south doorway to see what was happening outside and tried to make contact with someone he could connect with and talk to.  He saw only officers in helmets outside who were setting up tactical gear.  The SWAT officers were in the trees and all over.

55.     At approximately 4:40 p.m., when Plaintiff looked out through the south doorway another time, a SWAT officer told Plaintiff that he had better come out because they were preparing to break the windows and fire tear gas.

56.     Plaintiff did not have the funds to pay for any damage to the apartment, so he ran to get his bathrobe (because he finds the jails too cold), dog, and leash.

57.     At approximately 4:47 p.m., Plaintiff threw his lantern/spotlight out the south-facing door.  Then he stepped outside the south doorway with his hands up and bathrobe over his shoulder.  (It was too hot to wear it.)  Plaintiff had his dog on a leash and held the leash with his raised left hand.  A SWAT officer yelled, "You made the right decision.  You are doing great.  Keep coming."

58.     Four SWAT officers in a line were crouched down 10 to 12 feet away from the apartment building, and four other SWAT officers were standing in line behind the four officers who were crouched down.  The SWAT officer who yelled at Plaintiff ("You made the right decision.  You are doing great.  Keep coming.") was on the south end of one of the lines of four SWAT officers.

59.     With his hands up, Plaintiff walked through the chain-link-fence gate.

60.     The SWAT officer yelled, "You are doing great.  Keep coming."

61.     With his hands up, Plaintiff took another couple very slow steps along the west side of the apartment building.

62.     The SWAT officer yelled, "You are doing great.  Keep coming."

63.     With his hands up, Plaintiff took another couple very slow steps along the west side of the apartment building until he was approximately in front of the single window on the west side of the apartment building, between the Bearcat armored vehicle and the west side of the apartment building.

64.     Without warning, and while he was standing in front of the Bearcat with his hands raised, Plaintiff is informed and believes and thereon alleges that Defendant Sergeant SIMS ordered Police Officer Joseph Armijo to launch a 40 mm non-lethal round at point-blank range that struck Plaintiff in the lower abdomen.

65.    Plaintiff is informed and believes and thereon alleges that simultaneously with the firing of the 40 mm non-lethal round, Defendant SIMS ordered Defendant SCHLEICHER to immediately release his K-9.

66.    SCHLEICHER released his dog without any prior warning to Plaintiff.

67.    The dog bit Plaintiff on the left leg and arm and began violently shaking his left arm.

68.    When it felt as though the dog locked its jaws on his left arm, Plaintiff fell to the ground.  The dog continued its attack.

69.    Many of the officers on site huddled around Plaintiff so that the cameras on site could not record what has happening to Plaintiff.  There were so many officers surrounding him that Plaintiff could not see any daylight.

70.    The dog ripped flesh from Plaintiff's left arm and chewed on his left leg.

71.    Plaintiff begged for help, but Defendant Police Officers BLANKENSHIP, CELEDON, DOYLE, KNIFFEN, and SKIDMORE, who were within a few feet of Plaintiff and able to intercede, failed to intercede to stop the K-9's continuing attack. Indeed, some of the officers made positive comments about the ongoing dog attack.

72.    The K-9's attack went on for approximately one minute and tore Plaintiff's left arm down to the bone.   Plaintiff screamed for help.

73.    Defendants SCHLEICHER, BLANKENSHIP, CELEDON, DOYLE, KNIFFEN, and SKIDMORE watched the continuing attack.  No one intervened.

74.    Finally, to prevent the K-9 from fatally injuring Plaintiff, SCHLEICHER finally called off his dog.

75.    Defendants BLANKENSHIP, CELEDON, DOYLE, KNIFFEN, SKIDMORE and DOES 1 through 20 then piled on Plaintiff as he was lying on the ground bleeding from the dog attack and pulled him in all sorts of different directions. Defendants unnecessarily tore Plaintiff's right rotator cuff as he was not resisting.  The officers provided no first aid.

76.     Plaintiff did hear some of the non-SWAT officers expressing disgust with the attack on Plaintiff ("This is not right." "Someone dropped the ball." "Glad I was not involved.").

77.     After about five minutes, an ambulance driver put Plaintiff into the ambulance and took him to Kern Medical for treatment of his dog-bite injuries.

78.     Plaintiff is informed and believes and thereon alleges that his attack was video-recorded by approximately 66 belt recorders and drone aircraft.  None of the 66 belt recordings will show Plaintiff holding anything that looks like a gun or making threats to anyone.

79.     At approximately 5:19 p.m., the CITY police officers obtained a search warrant for the Residence from Judge Camacho.

80.     Police Officers Selman and Armijo and Defendant BLANKENSHIP conducted a search of the Residence pursuant to the search warrant.  BLANKENSHIP found a toy BB gun pistol under the mattress in the bedroom.

81.     Plaintiff was later arrested for violation of *Penal Code* section 148(a)(1) (resisting, delaying, obstructing police officer).

82.     This charge was subsequently dismissed when, Plaintiff is informed and believes, the district attorney reviewed the belt recordings of the entire afternoon culminating in the brutal K-9 attack and mauling.

83.     Plaintiff underwent surgery to reconnect the nerves torn in his left arm. Later, he had plastic surgery to repair the left arm.

///

///

# I.

## FIRST CAUSE OF ACTION

## VIOLATION OF FOURTH AMENDMENT—EXCESSIVE FORCE

### [42 U.S.C. § 1983]

(By Plaintiff Against Defendants SIMS and SCHLEICHER)

84.    Plaintiff incorporates by reference paragraphs 1-83 as though fully set forth herein.

85.    On October 8, 2021, at approximately 12:56 p.m., Kern County Probation Officer E. Meyer and his unit sought to serve Plaintiff a probation-violation warrant at his Residence.  Someone banged on Plaintiff's south-facing door.

86.    At that time, Plaintiff was entering the shower with his bathroom fan running.  He heard someone banging on the door, but decided not to answer it because no one knew he was home.

87.    Officer Meyer knew Plaintiff well and that Plaintiff suffered mental-health issues as a consequence of his prior contacts with Plaintiff.

88.    At 1:25 p.m., Officer Meyer requested that additional Kern County probation officers respond to the Residence.

89.    Additional probation officers, including Rodolfo Rivera, arrived at or about 1:30 p.m. and prepared to enter the Residence.

90.    The probation officers or the Bakersfield Fire Department broke the lock on the security door protecting the south-facing door.

91.    Plaintiff heard someone breaking his security door and believed that local gangsters were invading his home.  Plaintiff was scared and screamed something like, "You guys are crazy!  How do you know that I have no weapon?"

92.    The probation officers ceased their banging on the door and retreated.

93.    Plaintiff first realized that it must have been probation officers pounding on his door when he looked outside and saw multiple officers.

94.     Between 1:30 and 2:30 p.m., numerous Bakersfield Police officers arrived to the Residence, and Plaintiff became increasingly alarmed and stressed.

95.     The CITY Police Department Crisis Negotiation Team ("CNT") arrived on the scene and set up operations in a trailer.  A female negotiator talked to Plaintiff on the cell phone.  Plaintiff told the CNT that he was off his mental-health medications and was not feeling well.

96.     Between 1:30 and 4:47 p.m., the CITY Police Department deployed to Plaintiff's Residence a Bearcat armored vehicle, the CITY SWAT team, Senior Officer SCHLEICHER and his K-9 partner, drone aircraft, bomb-squad robot, a 40 mm non-lethal projectile launcher, and a total of 66 probation and police officers.  Plaintiff, quite reasonably, was scared.

97.     The deployment of an armored vehicle and the SWAT team was completely disproportionate to the circumstances because Plaintiff had made no verbal threats, fired no shots, pointed no weapons at officers, and held only his phone or lantern/spotlight in his hands.

98.     Plaintiff told Probation Officer Meyer on the cell phone that he was suffering from a mental-health crisis and was afraid to come outside.

99.     Although there were 66 officers on the site, Plaintiff was never able to talk to someone with apparent mental-health or crisis-negotiation skills.  A reasonable officer would have realized that Plaintiff was intimidated and frightened by the 66 officers, SWAT team, Bearcat armored vehicle, bomb-squad robot, and drones flying overhead.

100.    Plaintiff repeatedly looked out through the south doorway to see what was happening outside and tried to make contact with someone he could connect with and talk to.  He saw only officers in helmets outside who were setting up tactical gear.  The SWAT officers were in trees and all over.

101.   At approximately 4:40 p.m., when Plaintiff looked out through the south doorway another time, a SWAT officer told Plaintiff that he had better come out because they were preparing to break the windows and fire tear gas.

102.   Plaintiff did not have the funds to pay for any damage to the apartment, so he ran to get his bathrobe (because he finds the jails too cold), dog, and leash.

103.   At approximately 4:47 p.m., Plaintiff threw his lantern/spotlight out the south-facing door.  Then he stepped outside the south doorway with his hands up and bathrobe over his shoulder.  Plaintiff had his dog on a leash and held the leash with his raised left hand.  A SWAT officer yelled, "You made the right decision.  You are doing great.  Keep coming."

104.   With his hands up, Plaintiff walked through the chain-link-fence gate.

105.   The SWAT officer yelled, "You are doing great.  Keep coming."

106.   With his hands up, Plaintiff took another couple very slow steps along the west side of the apartment building.

107.   The SWAT officer yelled, "You are doing great.  Keep coming."

108.   With his hands up, Plaintiff took another couple very slow steps along the west side of the apartment building until he was approximately in front of the single window on the west side of the apartment building, between the Bearcat armored vehicle and the west side of the apartment building.

109.   Without warning, and while he was standing in front of the Bearcat with his hands raised, Plaintiff is informed and believes and thereon alleges that Defendant Sergeant SIMS ordered Police Officer Joseph Armijo to launch a 40 mm non-lethal round at point-blank range that struck Plaintiff in the lower abdomen.

110.   Plaintiff is informed and believes and thereon alleges that simultaneously with the firing of the 40 mm non-lethal round, Defendant SIMS ordered Defendant SCHLEICHER to immediately release his K-9.

111.   SCHLEICHER released his K-9 without any prior warning to Plaintiff.

112.   The dog bit Plaintiff on the left leg and arm and began violently shaking his left arm.

113.   When it felt as though the dog locked its jaws on his left arm, Plaintiff fell to the ground.  The dog continued its attack.

114.   Many of the officers on site huddled around Plaintiff so that the cameras on site could not record what has happening to Plaintiff.  There were so many officers surrounding him that Plaintiff could not see any daylight.

115.   The dog ripped flesh from Plaintiff's left arm and chewed on his left leg.

116.   Plaintiff begged for help, but Defendant Police Officers BLANKENSHIP, CELEDON, DOYLE, KNIFFEN, and SKIDMORE, who were within a few feet of Plaintiff and able to intercede, failed to intercede to stop the K-9's continuing attack. Indeed, some of the officers made positive comments about the ongoing dog attack.

117.   The K-9's attack went on for approximately one minute and tore Plaintiff's left arm down to the bone.   Plaintiff screamed for help.

118.   Defendants SCHLEICHER, BLANKENSHIP, CELEDON, DOYLE, KNIFFEN, and SKIDMORE watched the continuing attack.  No one intervened.

119.   Finally, to prevent the K-9 from fatally injuring Plaintiff, SCHLEICHER finally called off his dog.

120.   Defendants BLANKENSHIP, CELEDON, DOYLE, KNIFFEN, SKIDMORE and DOES 1 through 20 then piled on Plaintiff as he was lying on the ground bleeding from the dog attack and pulled Plaintiff in all sorts of different directions.  Defendants unnecessarily tore Plaintiff's right rotator cuff as he was not resisting.  The officers provided no first aid.

121.   After about five minutes, an ambulance driver put Plaintiff into the ambulance and took him to Kern Medical for treatment of his dog-bite injuries.

122.   Sergeant SIMS and Senior Officer SCHLEICHER's use of a K-9 to attack Plaintiff was unreasonable because:

a.      Plaintiff was wanted only for a probation violation.

b.      Plaintiff made no attempts to flee his apartment.

c.      Plaintiff delayed his surrender so that he could make more attempts to call his wife before he surrendered.

d.      The probation and police officers knew that Plaintiff had mental-health issues, that he was off his medications, and that he was not feeling well.

e.      The CITY had no legitimate government interest in using force rather than to allow its Crisis Negotiation Team to negotiate Plaintiff's peaceful surrender.

f.      The CITY and County deployed a total of 66 officers to Plaintiff's Residence along with a SWAT team, Bearcat armored vehicle, bomb-squad robot, drone aircraft, and bomb-squad robot.

g.      Plaintiff was in constant communications with the CITY Crisis Negotiation Team and told the negotiator that he was off his medications and was not feeling well.

h.      The CNT negotiator knew that Plaintiff was suffering a mental-health crisis as a result of the large number (66) of officers assembled at his apartment with a SWAT team, bearcat armored vehicle, bomb-squad robot, and drone aircraft.

i.      Plaintiff had no firearms in the Residence.

j.      Plaintiff held only his cell phone and a lantern/spotlight in his hands. The lantern/spotlight could not reasonably be mistaken for a firearm because it had a large lens/reflector on the front and emitted a large beam of light.

k.      Plaintiff posed no threat whatsoever to the large assembly of SWAT officers deployed outside his apartment.

l.      The 66 belt-recordings taken of the incident show that Plaintiff made no threats and never held anything that could be mistaken for a weapon.

m.      Plaintiff never actively resisted arrest.

n. Plaintiff walked out of his apartment, at the direction of a SWAT officer ("You are doing great.  Keep coming."), with his hands raised and a bathrobe over his shoulder.

o. Defendant SIMS had several hours to determine the type and amount of force that reasonably appeared necessary, as the circumstances had not changed since 1:30 p.m.

p. As Plaintiff was standing outside between the Bearcat armored vehicle and the apartment building, with his hands raised, 10 to 12 feet in front of eight SWAT officers, Plaintiff is informed and believes and thereon alleges that Defendant Sergeant SIMS ordered Police Officer Joseph Armijo to, without prior warning, launch a 40 mm non-lethal round at point-blank range that struck Plaintiff in the lower abdomen.

q. Plaintiff is informed and believes and thereon alleges that simultaneously with the firing of the 40 mm non-lethal round, Defendant SIMS ordered Defendant SCHLEICHER to, without prior warning, release his K-9.

r. It would have been quite possible for Defendants SIMS and SCHLEICHER to have given Plaintiff warning of K-9 deployment as Plaintiff had walked out of his apartment with his hands up to surrender.

s. The dog bit Plaintiff on the left leg and arm and began violently shaking his left arm.

t. When it felt as though the dog locked its jaws on his left arm, Plaintiff fell to the ground.  The dog continued its attack.

u. Many of the officers on site huddled around Plaintiff so that the cameras on site could not record what has happening to Plaintiff.  There were so many officers surrounding him that Plaintiff could not see any daylight.

v. The dog ripped flesh from Plaintiff's left arm and chewed on his left leg.

w.     Plaintiff begged for help, but Defendant Police Officers BLANKENSHIP, CELEDON, DOYLE, KNIFFEN, and SKIDMORE, who were within a few feet of Plaintiff and able to intercede, failed to intercede to stop the K-9's continuing attack.  Indeed, some of the officers made positive comments about the ongoing dog attack.

x.     The K-9's attack went on for approximately one minute and tore Plaintiff's left arm down to the bone.   Plaintiff screamed for help.

y.     Defendants SCHLEICHER, BLANKENSHIP, CELEDON, DOYLE, KNIFFEN, and SKIDMORE watched the continuing attack.  No one intervened.

z.     Finally, to prevent the K-9 from fatally injuring Plaintiff, SCHLEICHER finally called off his dog.

aa.     Defendants BLANKENSHIP, CELEDON, DOYLE, KNIFFEN, SKIDMORE and DOES 1 through 20 then piled on Plaintiff as he was lying on the ground bleeding from the dog attack and pulled him in all sorts of different directions. Defendants unnecessarily tore Plaintiff's right rotator cuff as he was not resisting.  The officers provided no first aid.

123.   In commanding the K-9 to attack Plaintiff as he was peacefully surrendering to the SWAT team, Defendants SIMS and SCHLEICHER acted under color of law.

124.   Defendants SIMS and SCHLEICHER's use of the K-9 against Plaintiff on October 8, 2021, was unreasonable and deprived him of his Fourth and Fourteenth Amendment rights to be free of unreasonable seizures.

125.   As a consequence of cases such as *Lowry v. City of San Diego*, 858 F.3d 1248 (9th Cir. 2017); *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005); Miller *v. Clark County*, 340 F.3d 959 (9th Cir. 2003); *Watkins v. City of Oakland*, 145 F.3d 1087 (9th Cir. 1998); *Mendoza v. Block*, 27 F.3d 1357 (9th Cir. 1994); and *Koistra v. County of San Diego*, 310 F.Supp.3d 1066 (S.D. Cal. 2018), on October 8, 2021, it was clearly established and known to reasonable police officers that to command a K-9 to attack

and seriously injure a person who was surrendering to SWAT officers under the circumstances summarized in paragraph 122 violated Plaintiff's Fourth and Fourteenth Amendment rights to be free of unreasonable seizures.

126.   In causing Plaintiff to be unreasonably attacked by their dog, Defendants SIMS and SCHLEICHER acted intentionally, maliciously, and oppressively to cause Plaintiff pain, suffering, and emotional distress.

127.   Defendants SIMS and SCHLEICHER were motivated by evil motive.

128.   The acts of Defendants SIMS and SCHLEICHER were the proximate cause and moving force in the deprivation of Plaintiff's Fourth and Fourteenth Amendment rights.

## II.

### SECOND CAUSE OF ACTION

### VIOLATION OF FOURTH AMENDMENT—FAILURE TO INTERCEDE

### [42. U.S.C. § 1983]

(By Plaintiff Against Defendants BLANKENSHIP, CELEDON, DOYLE, KNIFFEN, and SKIDMORE)

129.   Plaintiff incorporates by reference paragraphs 1-83 as though fully set forth herein.

130.   On October 8, 2021, at approximately 12:56 p.m., Kern County Probation Officer E. Meyer and his unit sought to serve Plaintiff a probation-violation warrant at his Residence and banged on the south-facing door.

131.   At that time, Plaintiff was entering the shower with his bathroom fan running.  He heard someone banging on the door, but decided not to answer it because no one knew he was home.

132.   Between 1:30 and 4:47 p.m., the CITY Police Department deployed to Plaintiff's Residence a Bearcat armored vehicle, the CITY SWAT team, Senior Officer SCHLEICHER and his K-9 partner, drone aircraft, bomb-squad robot, a 40 mm non-

1  lethal projectile launcher, and a total of 66 probation and police officers. Plaintiff, quite
2  reasonably, was scared.

3      133.   The deployment of an armored vehicle, SWAT team, bomb-squad robot,
4  and K-9 was completely disproportionate to the circumstances because Plaintiff had
5  made no verbal threats, fired no shots, pointed no weapons at officers, and held only his
6  phone or lantern/spotlight in his hands. Plaintiff repeatedly told the Crisis Negotiation
7  Team and Probation Officer Meyer that he was off his medications, was suffering from
8  a mental-health crisis, and was afraid to come outside.

9      134.   At approximately 4:40 p.m., when Plaintiff looked out through the south-
10 facing doorway, a SWAT officer told Plaintiff that he had better come out because they
11 were preparing to break the windows and fire tear gas.

12     135.   At approximately 4:47 p.m., Plaintiff threw his lantern/spotlight out the
13 south-facing door. Then he stepped outside the south doorway with his hands up and
14 bathrobe over his shoulder. Plaintiff had his dog on a leash and held the leash with his
15 raised left hand. A SWAT officer yelled, "You made the right decision. You are doing
16 great. Keep coming."

17     136.   With his hands up, Plaintiff walked through the chain-link-fence gate.

18     137.   The SWAT officer yelled, "You are doing great. Keep coming."

19     138.   With his hands up, Plaintiff took another couple very slow steps along the
20 west side of the apartment building.

21     139.   The SWAT officer yelled, "You are doing great. Keep coming."

22     140.   With his hands up, Plaintiff took another couple very slow steps along the
23 west side of the apartment building until he was approximately in front of the single
24 window on the west side of the apartment building, between the Bearcat armored
25 vehicle and the west side of the apartment building.

26     141.   Without warning, and while he was standing in front of the Bearcat with
27 his hands raised, Plaintiff is informed and believes and thereon alleges that Defendant

28

- 19 -
COMPLAINT

Sergeant SIMS ordered Police Officer Joseph Armijo to launch a 40 mm non-lethal round at point-blank range that struck Plaintiff in the lower abdomen.

142.   Plaintiff is informed and believes and thereon alleges that simultaneously with the firing of the 40 mm non-lethal round, Defendant SIMS ordered Defendant SCHLEICHER to immediately release his K-9.

143.   SCHLEICHER released his K-9 without any prior warning to Plaintiff.

144.   The dog bit Plaintiff on the left leg and arm and began violently shaking his left arm.

145.   When it felt as though the dog locked its jaws on his left arm, Plaintiff fell to the ground.  The dog continued its attack.

146.   Many of the officers on site huddled around Plaintiff so that the cameras on site could not record what has happening to Plaintiff.  There were so many officers surrounding him that Plaintiff could not see any daylight.

147.   Defendants BLANKENSHIP, CELEDON, DOYLE, KNIFFEN, and SKIDMORE were among the officers closest to Plaintiff.

148.   The dog ripped flesh from Plaintiff's left arm and chewed on his left leg.

149.   Defendants BLANKENSHIP, CELEDON, DOYLE, KNIFFEN, and SKIDMORE had a duty to intercede when their fellow officers violate the constitutional rights of other citizens.

150.   Plaintiff begged for help, but Defendant Police Officers BLANKENSHIP, CELEDON, DOYLE, KNIFFEN, and SKIDMORE, who were within a few feet of Plaintiff and were able to intercede, failed to intercede to stop the K-9's continuing attack.

151.   The K-9's attack went on for approximately one minute and tore Plaintiff's left arm down to the bone.

152.   Defendants BLANKENSHIP, CELEDON, DOYLE, KNIFFEN, and SKIDMORE had a reasonable opportunity to intercede because they were within a few

1  feet of Plaintiff and the K-9, were dressed in tactical gear, and could have kicked,
2  thrown, punched, or hit (with a stick) the K-9 to stop the attack.
3    153.   Nevertheless, Defendants BLANKENSHIP, CELEDON, DOYLE,
4  KNIFFEN, and SKIDMORE watched the continuing attack and did nothing until
5  SCHLEICHER finally called off his dog to prevent the K-9 from fatally injuring
6  Plaintiff.  At that point, BLANKENSHIP, CELEDON, DOYLE, KNIFFEN, and
7  SKIDMORE piled on Plaintiff as he was lying on the ground bleeding from the dog
8  attack and pulled him in all sorts of different directions.  Defendants unnecessarily tore
9  Plaintiff's right rotator cuff as he was not resisting.
10    154.   The acts of Defendants BLANKENSHIP, CELEDON, DOYLE,
11  KNIFFEN, and SKIDMORE were the proximate cause and moving force in the
12  deprivation of Plaintiff's Fourth and Fourteenth Amendment rights.

### III.
### THIRD CAUSE OF ACTION
### VIOLATION OF FOURTH AMENDMENT—MONELL
### [42 U.S.C. § 1983]
(By Plaintiff Against CITY)

18    155.   Plaintiff incorporates by reference paragraphs 1-83 as though fully set forth
19  herein.
20    156.   On October 8, 2021, at approximately 12:56 p.m., Kern County Probation
21  Officer E. Meyer and his unit sought to serve Plaintiff a probation-violation warrant at
22  his Residence and banged on the south-facing door.
23    157.   Between 1:30 and 4:47 p.m., the CITY Police Department deployed to
24  Plaintiff's Residence a Bearcat armored vehicle, the CITY SWAT team, Senior Officer
25  SCHLEICHER and his K-9 partner, drone aircraft, bomb-squad robot, a 40 mm non-
26  lethal projectile launcher, and a total of 66 probation and police officers.  Plaintiff, quite
27  reasonably, was scared.
28

158.   The deployment of an armored vehicle, SWAT team, bomb-squad robot, and K-9 was completely disproportionate to the circumstances because Plaintiff had made no verbal threats, fired no shots, pointed no weapons at officers, and held only his phone or lantern/spotlight in his hands.  Plaintiff repeatedly told the Crisis Negotiation Team and Probation Officer Meyer that he was off his medications, was suffering from a mental-health crisis, and was afraid to come outside.

159.   At approximately 4:40 p.m., when Plaintiff looked out through the south-facing doorway, a SWAT officer told Plaintiff that he had better come out because they were preparing to break the windows and fire tear gas.

160.   At approximately 4:47 p.m., Plaintiff threw his lantern/spotlight out the south-facing door.  He then stepped outside the south doorway with his hands up and bathrobe over his shoulder.  Plaintiff had his dog on a leash and held the leash with his raised left hand.  A SWAT officer yelled, "You made the right decision.  You are doing great.  Keep coming."

161.   With his hands up, Plaintiff walked through the chain-link-fence gate.

162.   The SWAT officer yelled, "You are doing great.  Keep coming."

163.   With his hands up, Plaintiff took another couple very slow steps along the west side of the apartment building.

164.   The SWAT officer yelled, "You are doing great.  Keep coming."

165.   With his hands up, Plaintiff took another couple very slow steps along the west side of the apartment building until he was approximately in front of the single window on the west side of the apartment building, between the Bearcat armored vehicle and the west side of the apartment building.

166.   Without warning, and while he was standing in front of the Bearcat with his hands raised, Plaintiff is informed and believes and thereon alleges that Defendant Sergeant SIMS ordered Police Officer Joseph Armijo to launch a 40 mm non-lethal round at point-blank range that struck Plaintiff in the lower abdomen.

167.   Plaintiff is informed and believes and thereon alleges that simultaneously with the firing of the 40 mm non-lethal round, Defendant SIMS ordered Defendant SCHLEICHER to immediately release his K-9.

168.   SCHLEICHER released his K-9 without any prior warning to Plaintiff.

169.   The dog bit Plaintiff on the left leg and arm and began violently shaking his left arm.

170.   When it felt as though the dog locked its jaws on his left arm, Plaintiff fell to the ground.  The dog continued its attack.

171.   Many of the officers on site huddled around Plaintiff so that the cameras on site could not record what has happening to Plaintiff.  There were so many officers surrounding him that Plaintiff could not see any daylight.

172.   The dog ripped flesh from Plaintiff's left arm and chewed on his left leg.

173.   Plaintiff begged for help, but the 66 probation and police officers who were within a few feet of Plaintiff and were able to intercede, failed to intercede to stop the K-9's continuing attack.

174.   The K-9's attack went on for approximately one minute and tore Plaintiff's left arm down to the bone.

175.   The force applied to Plaintiff was unreasonable and deprived him of his Fourth and Fourteenth Amendment rights to be free of unreasonable seizures.

176.   In assembling 66 probation and police officers, an armored vehicle, SWAT team, bomb-squad robot, and K-9, and then commanding a dog to bite and hold Plaintiff while he was surrendering to the SWAT team, Defendants SIMS and SCHLEICHER acted under color of law and pursuant to the longstanding practice and custom of the CITY Police Department to condone violence and excessive force.

177.   The CITY Police Department's longstanding practice and custom of condoning violence and excessive force was the proximate cause and moving force in the deprivation of Plaintiff's Fourth and Fourteenth Amendment rights to be free from unreasonable seizures.

COMPLAINT

178.   As a proximate result of its longstanding practice and custom of condoning violence and excessive force, the CITY has the highest per-capita rate of officer-involved deaths in the United States.  These killings have been the reported in the national and international news.

179.   For instance, on December 1, 2015, *The Guardian* published a story (*The County: the story of America's deadliest police*) written by Jon Swaine and Oliver Laughland.  The authors found that Kern County has the highest rate of officer-involved killings per capita in the United States.  Among the citizens killed in 2015 by the CITY Police Department are Daniel Hernandez, Jr., Robert Burdge, Jason Alderman, and Traveon Avila.

180.   On February 3, 2023, a three-part series, *Killing County*, premiered on ABC News/Hulu.  The series was produced by Colin Kaepernick and ABC News Studios.

181.   The officer-involved killings spotlighted in the *Killing County* include those of Jorge Ramirez, Jr. (2013), David Silva (2013), James De La Rosa (2014), Jason Alderman (2015), and Francisco Serna (2016).  The program reported that these are a small portion of the killings of unarmed men that have led to millions in lawsuit settlements and the appointment of an independent monitor to oversee policy changes at the CITY Police Department.

182.   Plaintiff is informed and believes and thereon alleges that the force applied to him as he surrendered was found to be consistent with CITY Police Department policy, practice, and custom.

183.   Plaintiff is informed and believes and thereon alleges that Defendants SIMS and SCHLEICHER were not disciplined for their use of excessive force against Plaintiff.

184.   Plaintiff is informed and believes and thereon alleges that the CITY Police Department employs and retains officers who it knows have dangerous propensities for abusing their authorities and mistreating citizens.

185.  Plaintiff is informed and believes and thereon alleges that the CITY Police Department maintains grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining, and controlling officers' use of excessive force.

186.  Plaintiff is informed and believes and thereon alleges that no CITY Police officer has reported the use of excessive force against Plaintiff, and that the CITY Police Department has not investigated the use of excessive force against Plaintiff.

187.  Plaintiff is informed and believes and thereon alleges that the CITY Police Department policy is to *not* investigate claims of excessive force.

188.  Plaintiff is informed and believes and thereon alleges that the CITY Police Department policy is to *not* discipline officers accused of using excessive force.

THEREFORE, Plaintiff prays for judgment against Defendants as follows:

**ON THE FIRST CAUSE OF ACTION (§ 1983 EXCESSIVE FORCE)**

1.  For general and special damages;

2.  For exemplary and punitive damages;

3.  For attorney fees pursuant to 42 U.S.C. § 1988;

4.  For costs of suit; and

5.  For such other and further relief as the court may deem proper.

**ON THE SECOND CAUSE OF ACTION (§ 1983 FAILURE TO INTERCEDE)**

6.  For general and special damages;

7.  For exemplary and punitive damages;

8.  For attorney fees pursuant to 42 U.S.C. § 1988;

9.  For costs of suit; and

10.  For such other and further relief as the court may deem proper.

**ON THE THIRD CAUSE OF ACTION (§ 1983 MONELL)**

11.  For general and special damages;

12.  For attorney fees pursuant to 42 U.S.C. § 1988;

13.  For costs of suit; and

14.  For such other and further relief as the court may deem proper.

1

2                                                                     SKAPIK LAW GROUP

3

4    Dated: September 28, 2023                          By:

5                                                              Blair J. Berkley
                                                               Attorneys for Plaintiff
6                                                              JEFFREY AARON
                                                               MCFADDEN

7    ///

8    ///

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2        Plaintiff hereby demands trial by jury.

3

4                                                                          SKAPIK LAW GROUP

5

6

7     Dated: September 28, 2023                          By: _____

8                                                                          Blair J. Berkley
                                                                           Attorneys for Plaintiff
9                                                                          JEFFREY AARON
                                                                           MCFADDEN

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28