**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEFFREY AARON MCFADDEN, | Case No. 1:23-cv-01421 JLT CDB |
| Plaintiff, | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | **(Doc. 40.)** |
| CITY OF BAKERSFIELD, a municipal corporation, et al., | |
| Defendants. | |

## I.    INTRODUCTION

On October 8, 2021, City of Bakersfield police officers arrested Jeffrey McFadden. During his arrest, an officer shot Plaintiff with a beanbag, and a police dog, Kane, bit him. Plaintiff alleges Sergeant Sims and Officer Schleicher violated his Fourth Amendment rights by using excessive force and Officers Blankenship, Celedon, Doyle, Kniffen, and Skidmore (collectively, "Restraining Officers") violated his rights by failing to intercede against the use of excessive force.[1]  (Doc. 1 at ¶¶ 84–154.)  Plaintiff alleges the City of Bakersfield violated his Fourth Amendment rights under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), for failing to train Officer Schleicher and discipline him for prior incidents of excessive force by Kane and for having a longstanding custom and practice of condoning

---

[1] Plaintiff does not allege Defendants used excessive force in shooting him with a less lethal round. Officer Armijo, who shot Plaintiff with the beanbag, is not a named as a defendant.

1

violence and excessive force.  (Doc. 1 at ¶¶ 155–88.)

Defendants move for summary judgment or partial summary judgment. Because there are no genuine disputes of material fact, the issues presented to the Court are questions of law. For the reasons explained below, Defendants' motion for summary judgment is **GRANTED**.

## II.    OBJECTIONS

### A.    Evidentiary Objections

Under Federal Rule of Civil Procedure 56, litigants who move for or oppose summary judgment must cite "particular parts of materials in the record" to show specific facts are disputed, undisputed or cannot be proved.  *See* Fed. R. Civ. P. 56(c)(1).  The Eastern District of California's local rules implement Rule 56 by requiring a separate statement proposing undisputed facts.  *See* E.D. Cal. L.R. 260(a).  The separate statement must "cite the particular portions" of the record that establish each proposed fact as undisputed.  *Id.*  The opposing party must then respond to each proposed fact on the list and either admit or deny that fact is undisputed.  *See* E.D. Cal. L.R. 260(b).  If the opposing party contends the fact is disputed, it must cite "the particular portions" of the record showing the fact is disputed.  *Id.*  The opposing party may also file a statement of disputed facts and the source thereof in the record.  *Id.*  As noted above, the parties have both filed separate statements of fact, disputed each other's statements, and registered numerous evidentiary objections.  *See* (Docs. 40-2, 43-1, 43-4, 43-5, 43-6, 43-7, 43-8, 43-9, 43-10, 45, 47, 48.)

"[E]videntiary objections to [an opposing party's] separate statement[] of undisputed facts are not considered [at summary judgment] because such objections should be directed at the evidence supporting those statements." *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122, 1126 n.1 (E.D. Cal. 2008) (internal quotation marks omitted); *see also Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006)  Additionally, "objections to the characterization, weight, or credibility of evidence, such as [the declarant] misstates facts or his statement is vague and ambiguous are not proper evidentiary objections to evidence put forth at summary judgment." *Sernoffsky v. Novak*, 773 F. Supp. 3d 988, 1000 (S.D. Cal. 2025) (citation, internal alterations, and internal quotation marks omitted.)

Accordingly, the Court disregards these objections.

Many of the parties' objections relate to the form of the evidence. *See, e.g.,* (Doc. 47 at 4) (Plaintiff objecting to Officer Armijo's declaration that Plaintiff was previously in possession of a firearm as lacking personal knowledge and being hearsay.) However, "a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001). Courts often overrule hearsay objections at summary judgment and litigants should not append long lists of formulaic objections to their summary judgment papers. *See City of Lincoln v. Cnty. of Placer*, 668 F. Supp. 3d 1079, 1086–87 (E.D. Cal. 2023). "This is especially true when many of the objections are boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence." *Doe v. Starbucks, Inc.*, No. 08-0582, 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009). Most of the hearsay objections raised here are either unsupported, or the underlying evidence could be admitted at trial. *See* (Docs. 47 at 2–8; 48 at 2–3.) For example, the above referenced objection to Officer Armijo's declaration would be admitted under Federal Rule of Evidence 803(3) because, true or not, this demonstrates what Armijo was told and what was in his mind at the time of the events. *See* (Doc. 47 at 4.)

On the other hand, Plaintiff relies on his responses to interrogatories propounded by Officer Celedon (Doc. 43-3 at 1092-1161). Interrogatory responses are not admissible by the responding party because they are hearsay. *AT&T Corp. v. Dataway Inc.*, 577 F. Supp. 2d 1099, 1109 (N.D. Cal. 2008); *Cardinal v. Lupo*, No. 18-CV-00272-JCS, 2019 WL 4450859, at *22 (N.D. Cal. Sept. 17, 2019); Judge William W Schwarzer, et al., Rutter Group Practice Guide: Federal Civil Procedure Before Trial § 11:1801 (The Rutter Group, 2026). Though Plaintiff attached a verification to the interrogatory responses, he verified only that he read the responses and knew their contents. (Doc. 43-3 at 1118) Under penalty of perjury, he attests that the information in the responses is true and correct but then indicates that some of the information is based upon information and belief and that as to this information he is informed and believes that the information to be true. *Id*. Though the Court is aware that this type of verification is standard

3

in discovery, it does not demonstrate that the information contained in the responses could be admitted at trial. Indeed, it is apparent that counsel prepared the responses, as demonstrated by the verification, and most are argumentative and/or conclusory and/or rely upon information that could not possibly have been known to Plaintiff except by his attorney telling him of it. Plaintiff makes no attempt to parse through the information contained in the responses that are within his personal knowledge or the information that could be admitted at trial. The Court declines to do Plaintiff's work for him. Thus, the defense objection to this evidence is **SUSTAINED** and the Court will not consider it.

Plaintiff's objections to improper foundation are unavailing. "While foundation objections can be appropriate in connection with summary judgment motions, frequent foundation objections, with no supporting argument or rationale are on their face unconvincing." *Quair v. Cnty. Of Kings*, No. 1:20-cv-01793, 2025 WL 1593088, at *3 (E.D. Cal. June 5, 2025) (internal citation omitted). Moreover, "[f]oundation and authenticity problems [] are nonfatal if the substance could conceivably be made admissible at trial." *City of Lincoln*, 668 F. Supp. 3d at 1087 (citation and internal quotation marks omitted). Plaintiff objects to many deposition transcripts as being improperly authenticated but "[a] deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 774 (9th Cir. 2002). This occurred here. (*See* Doc. 40-4 at 6, 48, 53, 69, 71, 88, 127, 167, 169, 195, 197, 209, 211, 235.)

Plaintiff's other foundation objections are equally meritless. He objects to the audio recording attached as exhibit B to the Diaz declaration as improperly authenticated, but he overlooks that Diaz *can* authenticate the recording under Federal Rule of Evidence 901(b)(1) because he conducted the interview. *See* (Doc. 47 at 5.) Plaintiff's numerous objections to lack of personal knowledge also fail because the declarants were present at the incident, and there are alternative methods to admit the evidence at trial, including through body camera footage. *See* (Doc. 47 at 2–8.) Accordingly, the Court relies only on admissible evidence here and, except as

4

noted above, it **OVERRULES** Plaintiff's and Defendants' evidentiary objections.

### B.      Plaintiff's Unsworn and Untimely Expert Report

When Plaintiff filed his opposition to the summary judgment motion on January 31, 2025, he omitted Ben Warren's Rule 26 Expert Report, which he intended to attach as Exhibit V to his opposition brief.  (Doc. 43.) After the defense filed their reply, on February 11, 2025, Plaintiff filed a notice of errata wherein he attached the Warren report.  (Doc. 49.)  Defendants object to the Warren report for failing to satisfy the general requirements for summary judgment affidavits or declarations under Federal Rule of Civil Procedure 56(c)(4).  (Doc. 48 at 2.)  Defendants also object to the Warren report as untimely based on Local Rule 230(c), which requires opposition papers to be filed no later than 14 days after the motion is filed.  E.D. Cal. L.R. 230(c). Plaintiff filed his notice of errata containing the Warren report 25 days after Defendants filed their motion for summary judgment.

Rule 56(c)(4) states "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  28 U.S.C. § 1746 requires affiants to declare "under penalty of perjury that the that the foregoing is true and correct."  The Warren report does not include this attestation and declares only that "under penalty of perjury, the above expressed opinions are clearly based on recognized standards of my background, education, and experience as it relates to law enforcement policy and procedure."  (Doc. 49 at 82.)  Plaintiff does not provide a separate sworn declaration by Mr. Warren attesting to the truth and correctness of the report.  "Unsworn expert reports do not qualify as affidavits or otherwise admissible evidence for the purpose of Rule 56 and may be disregarded by the court when ruling on a motion for summary judgment." *Estate of Nunez v. Cnty. of San Diego*, No. 3:16-cv-01412, 2018 WL 5817091, at *4 (S.D. Cal. Nov. 8, 2018) (quoting *Provident Life and Acc. Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001).) As noted above, when evaluating a Rule 56 motion, the Court may consider evidence that would be admissible at trial, yet there is no showing that the expert report *would* be admissible at trial. Indeed, in general, expert reports are not admissible at trial, at least not by the proponent of the report (Fed. Evid. Code 705), because they are "rife with

hearsay." *Live Face On Web, LLC v. Integrity Solutions Group, Inc.,* 421 F.Supp.3d 1051 (D. Colo. 2019); *See Liebling v. Novartis Pharms. Corp.*, 2014 WL 12576619, at *1 (C.D. Cal. Mar. 24, 2014) ("[I]t is well established that unsworn expert reports are inadmissible and cannot be used to create a triable issue of fact for purposes of summary judgment.") (citing cases where unsworn expert reports were found inadmissible). Expert reports are out-of-court statements by witnesses who would offer them for their truth, and which usually recite hearsay upon hearsay. Fed. Rule Evid. 801(c). Though expert witnesses, in appropriate circumstances, may rely on hearsay when forming their opinions (Fed. Evid. Code 703), their evidence is not a conduit through which a party may introduce hearsay. *United States v. Vera*, 770 F.3d 1232, 1237 (9th Cir. 2014). Thus, the Court **SUSTAINS** Defendants' objections to the Warren report and will not consider it.[2]

### III.    FACTUAL BACKGROUND

On October 8, 2021, at around 1:11 p.m., a Kern County Probation Officer contacted the Bakersfield Police Department to inform them of a situation at Plaintiff's residence, where Plaintiff had a "warrant for [a] probation violation" and was "refusing to open the door and [] in possession of a firearm." (Doc. 43-3 at 712.) Probation officers had approached the security screen door and in response to probation officers' orders to exit the apartment, Plaintiff locked the security door and refused to comply. (Doc. 43-3 at 730) The probation officers reported that they had forced entry through a security door. (*Id.* at 731) While doing so, one probation officer saw Plaintiff pointing a black semi-automatic handgun through the window and another saw a person's arm pointing a black semi-automatic handgun through the window but could not see the person holding the firearm. (Doc. 43-3 at 731) The "probation officers retreated from the apartment and requested the assistance of the Bakersfield Police Department." (Doc. 40-13 at 6)

"Plaintiff's front door faced south and was near the driveway on the west end of the building. (Doc. 40-4 at 253.) A chain-link fence approximately four feet south of the front door

---

[2] There appears to be no dispute that the defense had a copy of the report by the time the opposition was filed. Even still, a party must produce all exhibits to every motion to their opponent in a timely fashion even if the opponent has possession of the exhibit in its native form. Because the Court finds that the report is not properly sworn and excludes it on that basis, it need not consider whether the Court would exclude it on timeliness grounds.

ran parallel to the south side of the building and created a walkway from the front door to the driveway.  (*Id.* at 254.)  A gate separated the walkway from the driveway, but it was open while officers were stationed on the driveway.  (*Id.* at 237, 254.)  At around 1:43 p.m., a Kern County Probation Officer called BPD again to request assistance with Plaintiff.  (Doc. 40-4 at 49 [0:00:15–0:00:20].)  The Probation Officer informed BPD that Plaintiff possessed a semi-automatic handgun, was a felon with a felony warrant outstanding, had a history of assault with a deadly weapon, was refusing to come out of his residence, and was making suicidal statements.  (*Id.* at 49 [0:00:20–0:00:28], 112.) BPD dispatched officers, the Crisis Negotiation Team and the SWAT team to Plaintiff's residence beginning at around 1:48 p.m.  (Doc. 40-4 at 56, 93–102.) Kern County also deployed a Mobile Evaluation Team consisting of behavioral/mental health professionals.  (*Id.* at 49 [0:00:40–0:00:42], 51, 56.)

After arriving outside Plaintiff's residence, BPD officers evacuated people in the area and established a perimeter around the property.  (Doc. 40-4 at 24–25.)  Sergeant Sims asserted that when he arrived on the scene, Kern County Probation Officers informed him that they had seen Plaintiff with a firearm and that Plaintiff was on probation for assault with a deadly weapon.  (*Id.* at 24, 33–34.)  Sergeant Sims also reported that Probation Officers told him that Plaintiff had a history of drug and alcohol abuse, had absconded from probation, and had previously assaulted police officers and he learned from Officer Price, that Price had seen a weapon hon Plaintiff's body.  (*Id.* at 24, 33.) Sims broadcast this information to the other officers. (*Id.* at 33) Each named Defendant recalls being told before making physical contact with Plaintiff, that he was armed and had an outstanding warrant for assault with a deadly weapon.  (*Id.* at 17–18, 20–21, 64, 78, 85, 154–55, 164-65, 174–75, 206, 214–15.)  Officer Selman also knew Plaintiff from a prior interaction on January 6, 2019, during which Plaintiff attempted suicide by lying down on railroad tracks with the intent of being hit by an oncoming train.  (Doc. 43-3 at 775.) At that time, Plaintiff told Officer Selman then that he no longer wanted to live.  (*Id.*)  Officer Selman also learned from this past interaction that Plaintiff had previously attempted suicide by gas inhalation and ingesting a large quantity of pills.  (*Id.* at 778.)

For more than two hours, Officer Garcia from the BPD Crisis Intervention Team, along

7

with MET members, called Plaintiff over the phone to persuade him to exit his residence with his hands up and empty. (Doc. 40-10 at 2.) Several of Officer Garcia's calls to Plaintiff went straight to voicemail or ended abruptly. (*Id.* at 2; Doc. 43-1 at 18.) At 3:35 p.m., officers disconnected the power from Plaintiff's residence. (Doc. 43-3 at 811.) In addition to numerous phone calls from Officer Garcia to Plaintiff, a BPD PA system also made several announcements for Plaintiff to come outside with his hands up. (Docs. 40-4 at 132–33; 40-5 at 2; 40-10 at 2.)

During their conversations, Plaintiff made suicidal statements to Officer Garcia and informed her that he had not taken his bipolar and depression medication in months. (Doc. 43-3 at 1070, 1072.) Officers were unaware whether there were any other people with Plaintiff in his residence. (Doc. 40-4 at 26.) Officers attempted to contact Plaintiff's known family members but were unable to reach them. (*Id.* at 26; Doc. 40-10 at 2.) Also, Officer Selman spoke with Plaintiff from behind cover in Plaintiff's driveway, approximately 20-25 feet from Plaintiff's front door. (Doc. 43-3 at 734.)

Over the course of three hours, officers observed Plaintiff momentarily step in and out of his residence multiple times, often concealing parts of his body. (*Id.* at 130, 175, 216.) On several occasions when Plaintiff opened his door, Officer Selman ordered Plaintiff to exit his residence and surrender peacefully. (*Id.* at 175; Doc. 40-14 at 2.) At times, officers observed Plaintiff holding various objects, including a flashlight, camera, or cell phone when he stepped out. (Docs. 40-4 at 131; 40-5 at 2; 40-7 at 2.) Also, Officer Price saw Plaintiff with a weapon on his body. (Doc. 40-4 at 33) This information was broadcast to the officers on the scene. (*Id.*) Throughout this time, Officers Garcia and Selman repeatedly ordered him to "come out with your hands up," but Plaintiff did not.

Because they had been told that the Probation Officers saw that Plaintiff was armed and Price saw a weapon on Plaintiff's body, officers discussed how best to take him into custody. (Doc. 40-4 at 21–22.) Defendants contend that their preferred plan was for Plaintiff to surrender, but Officers Schleicher and Armijo with the agreement of Sergent Sims, also devised a plan to shoot him with a beanbag and to deploy the K-9 if Plaintiff did not. (*Id.* at 37–38, 159, 193–94.) Defendants formed two teams: an arrest team consisting of Officers Skidmore, Blankenship, and

Celedon, and a contact/hands-on team comprising Officers Armijo, Selman, and Schleicher with the K9.  (*Id.* at 22–23.)  Officer Armijo was designated to use a 40 mm launcher as a non-lethal option to take Plaintiff into custody, if necessary.  (*Id.* at 37–38.) Due to Plaintiff's repeated refusal to exit the home and surrender, rather than continuing to return inside the home, Defendants decided to shoot McFadden with the beanbag "if [he] exited the residence at any point and walked approximately 3 feet from the front door . . ."  (Doc. 40-4 at 193-194; Doc. 40-13 at 7.)

Defendants state that Officer Schleicher was the only certified canine handler involved in taking Plaintiff into custody.  (Docs. 40-6 at 2; 40-7 at 2; 40-9 at 2; 40-11 at 2; 40-15 at 2.) However, Plaintiff claims that Schleicher was not a properly trained POST certified canine handler and had only completed 30 minutes of POST approved canine training from January 26, 2015 through October 10, 2021.[3]  (Doc. 43-3 at 969–73, 994–95.) Officer Schleicher declares that he and his K9 partner attended training from December 15, 2018 through February 22, 2019, in addition to POST training.  (Doc. 40-12 at 4.)  At the time of the incident, BPD trained its officers according to standards set by POST, a "statewide quasi-governmental organization composed of law enforcement executives and advisors."  (Doc. 40-15 at 2.)  POST sets police training standards and "certifies local law enforcement agencies and their officers as in compliance with those standards."  (*Id.*)  Sergeant Sims declares that BPD's training is consistent with what POST mandates.  (*Id.* at 3.)

At 4:41 p.m., BPD dispatcher Alison Webb broadcast that Plaintiff "has [a] cam[era] in one hand and nothing [in the] other."  (Doc. 43-3 at 816.) One minute later, Webb broadcast that it "appears subj[ect] has unk[nown] obj[ect] in [his] right hand" and "unk[nown] obj[ect] in [his]

---

[3] Plaintiff claims that Schleicher was not a properly trained POST certified canine handler and had only completed 30 minutes of POST approved canine training from January 26, 2015 through October 10, 2021. (Doc. 43-3 at 969–73, 994–95.) The record cited by Plaintiff in his opposition, however, ignores that the records he cites do not speak to the training Schleicher and the K9 received. *Id*. Rather, Schleicher testified they duo received "about 480 hours" of training. *Id*. at 52. The transcript of the deposition of Schleicher reveals that the defense had not produced the K9 team training records initially and discovered this oversight at Schleicher's deposition. (Doc. 43-3 at 51-53) Upon recognizing this omission, defense counsel promised to produce the K9 team's raining record. (*Id*.) Despite this, Plaintiff fails to produce these records and disingenuously implies that the training records that were not designed to document the training related to the K9 are the only training records for Schleicher and the K9.

9

hand [is] covered by [his] shirt." (*Id.* at 816.) Plaintiff again returned inside his apartment. (*Id.*) At around 4:42 p.m., Plaintiff took one step outside his front door and began speaking with Officer Selman. (Doc. 40-4 at 237 [1:03:27–1:03:42].) He and an unknown object in his hand, which was covered by his shirt. (Doc. 43-3 at 817) While speaking with Selman, officers heard Plaintiff say that he was deciding whether he wanted to die. (Doc. 40-4 at 110, 237 [1:04:06–1:04:13].) Officer Selman assured Plaintiff that he did not want to die, gave him reasons to live, and told him to "just come on out." (*Id.* at 237 [1:04:10–1:04:32].) At 4:43, Plaintiff went back inside and then a few seconds later, he stepped outside. (Doc. 43-3 at 817.)

Plaintiff wore long, loose shorts and had a dark blanket draped over his left shoulder and left torso. (Doc. 40-4 at 177, 188.) Plaintiff carried a dog leash in his right hand, which was attached to a small dog. (*Id.* at 207; 237 [1:03:27–1:04:37].) At around 4:45 p.m., Officer Selman told Plaintiff to drop the blanket, but he refused. (*Id.* at 237 [1:05:29–1:05:40].) Plaintiff then went back inside his residence and returned holding a plastic water bottle. (*Id.* [1:05:50 – 1:06:10].) Officer Blankenship stated in his deposition that he saw Plaintiff also holding a cell phone when he exited the door but did not recall in which hand he was holding the phone. (Blankenship Depo. at pp. 66:23–67:3.)

At around 4:46 p.m., Plaintiff stood fully outside the front door threshold and raised the water bottle to take a drink. (Doc. 40-4 at 237 [1:06:00–1:06:10].) Plaintiff then lowered his arm to his waistband. (*Id.* [1:06:10–1:06:15].) Officer Selman told Plaintiff, "don't be reaching around man. Don't do it. Let's just make this easy. You know. Make it easy. Come on out man." (*Id.* [1:06:12–1:06:22].) Schleicher saw Plaintiff "continued to reach down with his right hand and feel the right pocket of his shorts," and is training and had experience informed him that this was consistent with someone trying to hold onto a concealed firearm. (Doc. 43-3 at 743)

Selman then told Plaintiff to step out and look at his window because officers were "about to rip it off and put gas in [his] house." (Doc. 40-4 at 237 [1:06:25–1:06:40].) At this time, Plaintiff's right arm was raised, leaning on the outer wall of his residence, and his left arm was at his abdomen, with the blanket continuing to shield the left side of his body. (*Id.* [1:06:35–1:06:40].) The officers planned to move the robot behind Plaintiff, to block him from re-entering

10

his apartment, but the robot malfunctioned. (Doc. 43-3 at 818)

Officer Selman told Plaintiff to "just come here right now" and Plaintiff began peeking around the corner of his residence towards the officers.  (Doc. 40-4 at 237 [1:06:38 – 1:06:44].) Plaintiff stepped towards the officers with his right arm down below his waistband and his left arm forward at a 90-degree angle, while holding the dog leash.  (*Id.* at 238 [0:48:33–0:48:38].)

Officers noted that Plaintiff stopped and looked around with a "frantic and nervous expression on his face." (Doc. 43-3 at 735; Doc. 43-3 at 732 [Plaintiff "was standing about five (5) feet from his door."]; (Doc. 43-3 at 743) ["Plaintiff paused momentarily and began to look around."] Officers are trained that this type of "behavior to be consistent with suspects who are either about to flee or begin to fight." (Doc. 43-3 at 743)

Fearing Plaintiff would return to the apartment to "again arm himself with the firearm," Officer Armijo considered that Plaintiff had been seen with a firearm earlier in the day, he had not been searched and was wearing baggy clothes that could conceal a firearm, and was close enough to his front door that he could re-enter the apartment and arm himself if he did not have the gun on his body, resulting in a much more serious situation (Doc. 43-3 at 735. Consequently, he determined that the "use of the less lethal force option was necessary to effect MCFADDEN'S arrest and incapacitate him so that Officers [could] safely take him into custody." (Doc. 43-3 at 735) Armijo determined that no warning should be given because he did "not want[ ] to alarm MCFADDEN and cause him to quickly re-enter the apartment." (*Id.*) "Armijo shot Plaintiff in the lower abdomen with the 40 mm round, which appeared to have no effect; it appeared to not cause Plaintiff any pain or cause him any incapacitation. (*Id.*)

Schleicher had also become concerned that Plaintiff would attempt to re-enter the apartment. (Doc. 43-3 at 743) By this time, he had learned that Plaintiff had assaulted a peace officer in the past. (Doc. 43-3 at 163-164) Schleicher believed that using his K-9 would facilitate Plaintiff's arrest. (*Id.*) He testified,

> There was urgency to, yes, prevent him from going back into the house and also to be able to take him into custody in a safe manner. Um, and with the firearm still outstanding, what -- the best option to do that was to utilize Kane. It does two things. It prevents him from being able to go back in, because I have Kane secured on a leash that would -- I can hold, and he would stop, um, continuing his

11

progression towards the front door. And also, Kane would provide a distraction for officers to come in and go hands-on so that McFadden could not retrieve the firearm that was still outstanding.

(Doc. 40-4 at 177-178) Schleicher explained that it appeared that Plaintiff was going to once again return to the apartment;

Well, he was coming out to us, and then he slowed his approach and stopped for a moment. That's when the 40-millimeter was deployed, because it seemed like he was contemplating coming out and surrendering or retreating back into the residence. He was also looking around to see where his avenue of escape was, and I recognized that. I believe, also, Armijo recognized that as well. And that's why he deployed the 40-millimeter at that time.

(*Id*. at 179) He continued, "I didn't see him take any backwards steps, but he stopped his forward progression, which led me to believe that he was preparing to start fleeing back into the residence." (*Id*. at 180.) Thus, within a split second of Armijo's shot, Officer Schleicher deployed the K-9 on a long line.[4] (Doc. 40-4 at 238 [0:48:38–0:48:40].) Given the distance to run to Plaintiff, it took about one-to-two seconds for the dog to reach Plaintiff who bit Plaintiff's upper left leg. (*Id*.) Upon being shot, Plaintiff had hunched over slightly, dropped the dog leash and brought his arms to his waist so that both his elbows and forearms were at his waistband, with his hands upward.  (Doc. 40-4 at 238 [0:48:34–0:48:40].) He was in this general position when the dog bit him.

As the dog bit him, Plaintiff bent over and used his hands to push the dog away.  (*Id.* [0:48:37 – 0:48:40].) Plaintiff fell to the ground and tried to disengage the dog, while Schleicher pulled the dog and, thus, Plaintiff away from the apartment. As Schleicher joined the dog, he saw that it was then biting only Plaintiff's shorts. (Doc. 43-3 at 743).

By this time the Restraining Officers rushed toward Plaintiff and tried to place him in handcuffs, by trying to pull his right arm behind his back.  (Doc. 40-4 at 237 [1:06:44–1:07:00].) Celedon tried to control Plaintiff's right hand, but his left hand was free and was down near his waistline. (Doc. 43-3 at 743) Plaintiff rolled onto the dog's head, which caused it to release his

---

[4] If viewing the events through Officer Selman's body cam footage in isolation—as Plaintiff does in his opposition—it gives the false impression that the dog is deployed later, while Plaintiff stands stationary. Because the dog comes from a distance directly behind Selman, Schleicher's body cam reveals that Schleicher deployed the dog within a split second of the 40 mm launcher shot striking Plaintiff.

bite on the shorts and caused the dog to re-engage and bite Plaintiff's loose left forearm. (*Id.*) Throughout this time, the officers ordered Plaintiff to stop resisting, but Plaintiff did not and, instead, kept his right arm bent at a 90-degree angle nearly perpendicular to his torso, with his fist toward the sky, and it was stiffened/flexed.

Officer Blankenship positioned himself over Plaintiff's abdomen and tried to use his body weight to stop Plaintiff's resistance. (*Id.* at 198–99, 204.) Officer Celedon tried to grab Plaintiff's right arm and put his knee on Plaintiff's right hip. (*Id.* at 224–27.) Officer Doyle tried to grab Plaintiff's arms and placed his right knee on the upper part of Plaintiff's mid-upper back. (*Id.* at 149, 152.) Officer Kniffen tried to place his hands on Plaintiff's right leg and ankle and placed both of his knees on the back of Plaintiff's left leg. (*Id.* at 79–81.) Officer Skidmore tried to secure Plaintiff's lower left leg with his hands. (*Id.* at 58–59.) Throughout this time, the officers struggled to get control of Plaintiff's hands and legs. Finally, they were successful, and Officer Doyle placed Plaintiff in handcuffs. (*Id.* at 229–30.) Sergeant Sims had no physical contact with Plaintiff. (Doc. 40-4 at 36.)

Approximately 44 seconds after the K-9 first contacted Plaintiff, and immediately upon the officers taking control of Plaintiff's hands, Schleicher removed the dog. (Doc. 40-4 at 182, 186.) Officer Schleicher testified that he waited to remove the dog from the bite until officers "had control of [Plaintiff's] arm and they could handcuff him." (*Id.* at 182.) No officer used force on Plaintiff once he was placed in handcuffs. (Docs. 40-6 at 2; 40-7 at 2; 40-9 at 2; 40-11 at 2; 40-16 at 2.) As a result of the arrest, Plaintiff suffered "20-30 transverse lacerations on [his] forearm" and "notable loss" of sensation in his ulnar nerve. (Doc. 43-3 at 1154.)

After Plaintiff was taken into custody, Sergeant Sims investigated the officers' use of force, which included reviewing body camera footage, interviewing Plaintiff and the involved officers, and preparing a "Use of Force" report. (Doc. 40-4 at 13–16, 47.) On October 11, 2022, Sergeants Diaz and Menedez also interviewed Plaintiff. (Doc. 40-8 at 2.) During the interview, Plaintiff stated that officers shot him with the beanbag, but it was ineffective and he was able to swat it away. (*Id.* at 5 [0:03:25–0:03:33].) Plaintiff also filed an excessive force complaint with the BPD Internal Affairs Division on October 11, 2022. (*Id.* at 2, 4.) On July 23, 2024, Internal

Affairs Detective Schlosser issued a report on her investigation of Plaintiff's complaint. (*Id.* at 5–8.) Detective Schlosser concluded that "[t]his incident appeared to be a typical SWAT callout, utilizing department procedures, with SWAT Commanders having oversight." (*Id.* at 8.)

## IV.    LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* The moving party bears the "initial responsibility" of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show a genuine dispute of a material fact exists. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. The Court views the record in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor, but the nonmoving party must set forth specific facts showing there is a genuine dispute for trial. *Id.* at 586 n.11, 587.

## V.    ANALYSIS

### A.    Excessive Force (Claim One)

Plaintiff alleges Officer Schleicher violated his Fourth Amendment right when Schleicher released the K9 onto Plaintiff without warning and allowed the dog to bite Plaintiff for an excessive duration. (Doc. 1 at ¶¶ 110–12, 122–24.) Plaintiff also alleges that Sergeant Sims violated his constitutional rights when he ordered Officer Armijo to shoot Plaintiff with a 40 mm less lethal round at point-blank range and ordered Officer Schleicher to release the K9 onto Plaintiff. *Id.*

The Fourteenth Amendment protects individuals who have not yet been convicted of a crime "from the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 388 (1989). However, allegations of excessive force during an arrest are analyzed under

14

the Fourth Amendment, which prohibits arrests without probable cause or other justification. *Id*. ("claim[s] that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' ... are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard"); *see also Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994) ("the use of force to effect an arrest is subject to the Fourth Amendment's prohibition on unreasonable seizures"). The Supreme Court explained:

> As in other Fourth Amendment contexts ... the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Graham*, 490 U.S. at 396-97 (1989) (internal citations omitted). In applying this standard, the Ninth Circuit instructs courts to consider "the totality of the circumstances and ... whatever specific factors may be appropriate in a particular case." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).

In *Graham*, the Supreme Court set forth factors to be considered in evaluating whether the force used was reasonable, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*., 490 U.S. at 396 (citing *Tennessee v. Garner,* 471 U.S. 1, 8-9 (1985). In addition, Court may consider "whether officers administered a warning, assuming it was practicable." *George v. Morris*, 736 F.3d 829, 837-38 (9th Cir. 2013) (citing Scott v. Harris, 550 U.S. 372, 381-82 (2007). Ultimately, the "reasonableness" of the actions "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

To determine whether an officer's use of force was excessive or unreasonable, courts conduct a three-step analysis.  First, the court "must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted." *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citation and internal quotation marks omitted).  Second, the court "must evaluate the government's interests

by assessing (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape." *Id.* Third, the court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Id.*

"Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive forces cases should be granted sparingly." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc) (citation and alteration omitted). "[T]he reasonableness of officer conduct should be decided by a jury where the inquiry turns on disputed issues of material fact." *Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1046 (9th Cir. 2014). However, because there are no genuine issues of material fact here—especially because the events are preserved in bodycam and audio footage— and "the relevant set of facts" has been determined, the reasonableness of the use of force is "a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381, n.8 (2007).

> 1.    Officer Schleicher

> a.    *Severity of the Intrusion*

The severity of using a police dog during an arrest depends on the specific factual circumstances. *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017). "Both the nature and degree of physical contact and the risk of harm and actual harm experienced are relevant." *Seidner v. de Vries*, 39 F.4th 591, 597 (9th Cir. 2022) (citation, alteration, and internal quotation marks omitted). The Ninth Circuit has "classified deployment of a police dog as both a severe use of force and a moderate use of force depending on the suspect's condition when the dog was ordered to attack, how long the attack lasted, and whether the dog was within its handler's control." *Id.* In *Miller v. Clark County*, the Ninth Circuit found the use of force by a police dog was "considerable" and "exacerbated by the duration of the bite" because the officer "permitted the dog to bite and hold" the plaintiff for between forty-five and sixty seconds, which the Court considered "an unusually long time period . . ." 340 F.3d 959, 964 (9th Cir. 2003). Similarly, in *Rosenbaum v. City of San Jose*, the Court held "a reasonable jury could find that

Defendants exceeded the force reasonably necessary to effectuate an arrest by allowing [the police dog] to continue biting [the plaintiff] for more than twenty seconds after he had fully surrendered and was under officer control." 107 F.4th 919, 926 (9th Cir. 2024). In contrast, the Court in *Lowry* concluded the use of force was moderate because the police dog handler "closely followed [the canine] and called her off [within seconds] after the initial contact with [the plaintiff]." 858 F.3d at 1257. The risk and actual harm caused by the police dog was also moderate because "the encounter between [the plaintiff and the canine] was so brief that [the officer] did not even know if contact had occurred." *Id.*

Here, the K9 bit Plaintiff for approximately 44 seconds, though during some of this time the dog bit Plaintiff's clothing, rather than his body. Throughout this time, Plaintiff refused to submit to the officers' orders and resisted the officers' efforts, pulled his arm away from them and prevented them from placing him in handcuffs and pulled away from the dog's bite. Once the officers got control of the plaintiff's left hand, Officer Schleicher immediately removed the dog from the bite. The plaintiff received multiple puncture wounds from the dog's bite, "causing intense pain, nerve damage, contracture and requiring reconstructive plastic surgery to heal." (Doc. 43 at 20) Thus, it appears that Officer Schleicher used an intermediate level of force in arresting Plaintiff when he deployed the K9.

b.    *Government Interest*

Next, courts "evaluate the government's interests by (1) assessing the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape." *Espinosa*, 598 F.3d at 537. These factors, set forth in *Graham*, however, are not exclusive and the totality of the circumstances test properly considers "whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citation omitted). The Ninth Circuit has also considered "whether proper warnings were given" as a relevant factor in determining the government's use of force. *Glenn v. Washington Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011). "Appropriate warnings comport with actual police practice" and "such warnings should be given, when feasible, if the use of force may

17

result in serious injury." *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001).  The most important factor, however, is whether the suspect posed an "immediate threat to the safety of the officers or others." *Smith*, 394 F.3d at 702.  "A simple statement by an officer that he fears for his safety or the safety [of] others is not enough; there must be objective factors to justify such a concern." *Bryan*, 630 F.3d at 826 (citation omitted). Likewise, "[a] desire to resolve quickly a potentially dangerous situation is not the type of governmental interest, that, standing alone, justifies the use of force that may cause serious injury." *Deorle*, 272 F.3d at 1281.

In assessing alternatives, however, we must not forget that "officers 'are not required to use the least intrusive degree of force possible.'" *Nelson*, 685 F.3d at 882 (quoting *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994)). As *Graham* cautioned, courts must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." 490 U.S. at 397.

The Court concludes that the use of the police dog by Schleicher was reasonable. First, the severity of the crime weighs in favor of the use of force.  "Under this factor, however, we look not simply to the kind of offense at issue, but to the circumstances of the case to determine whether they " 'warrant the conclusion that [the suspect] was a particularly dangerous criminal or that his offense was especially egregious.' " *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1061 (9th Cir. 2024) quoting *Smith v. Hemet*, 394 F.3d 689, 702 (9th Cir. 2005). Plaintiff was a felon with an outstanding felony warrant for assault with a deadly weapon, probation officers had seen him in possession of a firearm, and he was in violation of the terms of his parole. (Doc. 40-4 at 174.) He made statements consistent with having suicidal ideations, he had attempted suicide in the past, and officers did not know whether anyone else was in the apartment. "The government has an undeniable legitimate interest in apprehending criminal suspects, . . . and that interest is even stronger when the criminal is [] suspected of a felony, which is by definition a crime deemed serious by the state." *Miller*, 340 F.3d 964 (internal citation omitted.)  Accordingly, the first *Graham* factor favors the government.

Second, Plaintiff posed an immediate threat to others and made movements suggestive of

an attempt to flee. He was known to be dangerous, give his felon status and his outstanding warrant for assault with a deadly weapon and officers saw him to possess a semiautomatic handgun and the possession of the handgun was confirmed by another probation officer. Also, during the standoff, Officer Price saw that Plaintiff had a weapon on his body. (Doc. 40-4 at 33) He made statements indicating that he was deciding whether he wanted to die, he tried to kill himself in the past by using others to do the act—by lying on train tracks--and exited his apartment with part of his body obscured by a blanket despite explicit orders that he remove the blanket. Plaintiff continued to reach for his waistband and grab at his pockets despite being ordered not to do that, and Officer Schleicher had been trained that this was consistent with someone who possessed a concealed firearm. Lesser force options—the use of the bean bag round—was swatted away by plaintiff and had no effect. Likewise, Schelicher removed the dog from Plaintiff immediately upon the other officers gaining control over him despite Plaintiff's resistance. *Hernandez v. Town of Gilbert*, 989 F.3d 739, 745 (9th Cir. 2021)[A police officer cannot lawfully allow a police dog to continue biting a suspect who has fully surrendered.] Finally, Plaintiff displayed body movements, which the officers had been trained were consistent with a suspect deciding whether to fight or flee.

The Court is not unconcerned about the failure to give a warning immediately before Schleicher released the K9. However, Schleicher's bodycam footage reveals that he released the dog a fraction of a second after Armijo fired the beanbag, making no warning possible.  Armijo did not give a warning, and Plaintiff has not challenged either this fact or the fact that Armijo shot him with the launcher. Indeed, Plaintiff admitted in his complaint that Schleicher released the K9 "simultaneously with the firing of the 40 mm non-lethal round." (Doc. 1 at 13, ¶ 110) Because Schleicher's act in releasing the dog occurred a split second after Armijo's shot, there appears to be no evidence that giving a warning was within Schleicher's control.

Even still, the evidence shows that officers warned Plaintiff earlier in the standoff that the dog would be used. (Doc. 40-4 at 177) Likewise, he was fully aware of the force he confronted. Each time Plaintiff stepped out of his apartment, he saw that the entire area outside his home was filled with law enforcement officers wearing SWAT gear and holding firearms pointed at him,

19

even while they tried to get him to surrender. The police dog was present for an extended period before he was deployed and the dog's barks, whines and distinctive dog noises can be heard on the bodycam footage. This isn't a situation in which Plaintiff could be unaware that the police were prepared to use force to take him into custody. In fact, the event began with probation officers attempting to force open his security door.

When Plaintiff exited the apartment for the final time, Schleicher explained why he did not give an additional warning.

> And the reason I did not give a K-9 announcement is because he had already demonstrated that he was going to retreat back into the residence, as he's done so multiple times while we were on scene. And if I had made a K-9 announcement, he was only five feet away from his front door, he would have decided to run back in the house, further extending this situation making it extremely dangerous for officers. Um, when we deployed Kane, it needed to happen immediately to take him into custody immediately to make it safer for the officers and for McFadden. Because, like I said, we'd seen him with a firearm on a couple separate occasions, and then he comes out wearing a blanket and baggy clothing. He could be concealing a firearm. And before he exits the first time, as he's standing in the doorway, I could tell he kept checking the right side of his pants, you know, tapping on his pocket. Um, I found that to be consistent with what I'd seen in the past. People that are armed with firearms, they will check the pocket to make sure the firearm is still secured, and that's what I observed him doing before he started walking away from the front door.

(Doc. 40-4 at 177-178)

The defense cites *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017), for the proposition that the amount of force used here was objectively reasonable. In *Lowry*, police were called to an alarm going off at a commercial building at 11 p.m. *Lowry* at 1253. They suspected "that a burglary might be in progress and that the intruder could be lying in wait." *Id*. They entered the building and found a darkened office, with the door propped open. *Id*.  The police called out orders for the suspect to surrender and warnings that they had a police dog. *Id*. After receiving no response, they released the dog, which found Lowry asleep on the couch and, when trying to apprehend her, the dog bit her lip. *Id*. at 1254.

The Ninth Circuit held that the officers reasonably concluded that a burglary was in progress. *Lowry*, at 1258. The officers believed that the burglar might be armed. *Id*. No one responded to their warnings. The Court concluded that based on these circumstances, the officers faced "objectively menacing circumstances" such to justify their use of force. *Id*

20

Unlike in *Lowry*, Officer Schleicher kept the K9 on a leash during the entire event and he was within feet of the dog the entire time. Officer Schleicher stood ready to remove the dog once the other officers gained control of the left hand. Officers are yelling to get control over Plaintiff's left hand, and when they did, Schleicher immediately removed the dog. The circumstances here were no less menacing. Schleicher knew that Plaintiff was a felon, with an outstanding warrant for assault with a deadly weapon, had previously assaulted a peace officer, had been seen pointing a black semi-automatic firearm at the probation officers, and made statements indicating a desire to die during the encounter.

Though the failure to issue a warning weighs against the finding that the use of the K9 was reasonable, the other factors weigh more heavily. Consequently, from the perspective of a reasonable officer on the scene, the type and amount of force inflicted was moderate, there was a strong interest in using the force to take Plaintiff into custody, and the degree of force used was commensurate with that interest in the use of that force. Using the K9 to facilitate taking Plaintiff into custody and to overcome his resistance was reasonable. Thus, the Court **GRANTS** summary judgment to defendant Schleicher on the first cause of action. the Court finds that the use of the

c.     *Qualified Immunity*

Even if the Court found that a factual dispute precluded summary judgment as stated above, it would find that Schleicher is entitled to qualified immunity. Qualified immunity is "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (citation and internal quotation marks omitted). Qualified immunity has two prongs: (1) viewing the facts favorable to the plaintiff, whether the officers violated a constitutional right; and (2) whether that right was "clearly established" at the time of the violation.  *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir.

2017).  "A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curium) (citation and internal quotation marks omitted.)  To find that a right is clearly established, courts generally "need to identify a case where an officer acting under similar circumstances was held to have violated" the Constitution.  *City of Escondido v. Emmons*, 586 U.S. 38, 43 (2019) (per curium) (citation omitted).  "There need not be a case directly on point, but the constitutional question must be beyond debate." *Scott v. Smith*, 109 F.4th 1215, 1226 (9th Cir. 2024) (citation and internal quotation marks omitted.)  The relevant precedent must define the right with a "high degree of specificity," so that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citation and internal quotation marks omitted.)  A reasonable jury could find Officer Schleicher violated Plaintiff's Fourth Amendment right when he prematurely released Kane onto Plaintiff without warning and allowed Kane to continue biting Plaintiff for longer than reasonably necessary to safely take him into custody.  Thus, qualified immunity applies if clearly established law sufficiently defined the contours of the right at the time the violation occurred.  *See Saucier v. Katz*, 533 U.S. 194, 202 (2001).

The Court agrees that the recent decision of *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044 (9th Cir. 2024), to be nearly factually identical to the facts here.  In *Hyer*, police were called to Hyer's home after receiving complaints that he was acting strangely by the other tenants of the home and that he had broken a window to try to enter another tenant's living room and had attempted to break into a cotenant's bedroom. *Id*. at 1052. Officers twice went to the home and found that Hyer appeared to be suffering from a mental health episode. (*Id*.) They received authorization to place Hyer in emergency hospitalization for a mental health evaluation. (*Id.*) While officers attempted to take Hyer into custody, he made suicidal statements and managed to barricade himself inside his unit. (*Id*.) The standoff lasted nearly six hours, during which he brandished knives and a crossbow. (*Id*. at 1053-1054.) Eventually, after being warned, officers deployed a K9 who bit Hyer's left arm. (*Id*.) The SWAT team entered immediately after and found Hyer stabbing the dog with arrows. (*Id*.) Eventually, an officer shot and killed Hyer. (*Id*.)

22

Though the Ninth Circuit reversed the grant of summary judgment as to the shooting, it affirmed the grant of qualified immunity to the K9 officer who deployed the dog. *Lowry*, at 1066. The Court held,

> Finally, with respect to the defendant officers' use of the police dog, we conclude that Hyer's constitutional right to be free from such force was not clearly established at the time of his encounter with HPD, even assuming that this particular use of force was not objectively reasonable.
>
> Our court has considered whether it was clearly established that police officers violate a suspect's Fourth Amendment rights by "using minimal force at the beginning of an encounter and escalating the level of force employed, ultimately deciding to use a police dog when other methods were unsuccessful." *Hernandez v. Town of Gilbert*, 989 F.3d 739, 745 (9th Cir. 2021). In Hernandez—which considered law established as of May 5, 2016—we compared the facts of the immediate case to our precedents involving police dogs, observing that the suspect in Hernandez had been warned several times about the police dog, was not known to be armed or unarmed, and was evading arrest for a DUI. *Id*. at 744–45. On these facts, we concluded that our precedents did "not place 'beyond debate' whether [the] use of a police dog to facilitate [the suspect's] arrest under the circumstances of this case violated the Fourth Amendment." *Id*. at 745.
>
> Here, Plaintiffs have pointed us to no precedent published since May 5, 2016, that supports their claim, nor have they identified a general constitutional rule in our caselaw that "may apply with obvious clarity to the specific conduct in question." *Taylor*, 592 U.S. at 9, 141 S.Ct. 52 (quoting Hope, 536 U.S. at 741, 122 S.Ct. 2508). Moreover, Plaintiffs provide no argument that this is an "obvious case." *Rivas-Villegas*, 595 U.S. at 6, 142 S.Ct. 4. We therefore conclude that the defendant officers did not have fair notice that their use of the police dog would be unconstitutional, and they are entitled to qualified immunity on this claim.

*Id.* at 1068–1069. Notably, *Hernandez* was decided just four days before the events in this case.

As noted, in *Hernandez,* the plaintiff was pursued by police because they suspected he was drunk driving. *Hernandez v. Town of Gilbert*, 989 F.3d 739, 742 (9th Cir. 2021). He ignored attempts to stop his car and instead drove home and parked in the garage and attempted to close the garage door, though the police prevented this. (*Id*.) For two and a half minutes, the officers gave him orders to leave the car and warned him that if he did not, he would be arrested for failing to obey the orders of a police officer. (*Id*.) Officers approached the car with guns drawn, because they did not know if he was armed. (*Id*.) One officer attempted to drag the plaintiff out of the car, but he resisted those efforts and remained in the car. (*Id*.) The officers sprayed him with pepper spray, but he still refused to comply. (*Id*.) The officers warned him that a police dog would be deployed if he did not leave the car, but the plaintiff refused to get out of the car. (*Id*.) Though the plaintiff closed the driver's side door and tried to close the passenger door of the car,

the dog managed to get inside and bit the plaintiff for 50 seconds in total. (*Id.*) During this time, the plaintiff did not exit the car, despite saying he would do so. (*Id.*) Thirty-six seconds into the bite, the handler told the dog to release the bite, though the dog continued to bite for 14 more seconds. (*Id.* at 742-743.) Even still, the dog continued to bite the plaintiff's shirt. (*Id.* at 742) In total, the dog engaged on the plaintiff for 72 seconds. (*Id.*)

In affirming the grant of summary judgment, the Ninth Circuit noted that the plaintiff resisted the officer's command throughout the contact and actively resisted the officer who tried to pull him from the car and use lesser forms of force. *Hernandez*, at 744-745. Even after the dog bit him, the plaintiff said he would leave the car but did not so. (*Id.*) Finally, the Court determined that the length of the bite was not unreasonable because it lasted only during the time that the plaintiff resisted the orders and attempts to take him into custody. (*Id.* at 745-747) Thus, the Court held that the right to be free from the use of a police dog to attempt to take Hyer into custody, based upon the facts of the case, was not clearly established. Consequently, the Court affirmed the grant of qualified immunity as to the use of the police dog. (*Id.*) As in *Hernandez*, here, the bodycam footage makes clear there are no factual disputes to resolve.

As in the cases cited here, the Court finds that Plaintiff did not have a clearly established right that would have precluded Schleicher's use of the police dog to facilitate Plaintiff's arrest. Thus, as an alternate basis, the Court finds Schleicher is entitled to qualified immunity and therefor **GRANTS** him judgment on the first cause of action.

### 2. Sergeant Sims

Plaintiff alleges that Sergeant Sims, as the on-scene supervisor, was responsible for ordering Officer Armijo to shoot Plaintiff with a 40 mm less lethal round at point-blank range and ordering Officer Schleicher to release Kane onto Plaintiff without warning. (Doc. 1 at ¶¶ 110–12, 122–24.) "A supervisor may be held liable under § 1983 if he or she was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation." *Lolli v. Cnty. of Orange*, 351 F.3d 410, 418 (9th Cir. 2003) (citation and internal quotation marks omitted). This causal connection can be satisfied if the supervisor "set in motion a series of acts by others, or knowingly refused to

terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (citation and internal alterations omitted).  In other words, "[a] supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation . . .; or for conduct that showed a reckless or callous indifference to the rights of others." *Watkins*, 145 F.3d at 1093 (citation and internal quotation marks omitted.)

Because the Court concludes that Schleicher did not use excessive force and otherwise is entitled to qualified immunity, the claim against Sims fails. Thus, for the reasons set forth above related to Schleicher and because the Court finds alternatively that Sims is entitled to qualified immunity for the same reasons as it stated as to Schleicher, the Court **GRANTS** summary judgment as to Count One to Sims.

### B. Failure to Intercede (Claim Two)[5]

Plaintiff alleges the Restraining Officers violated their duty to intercede when Officer Schleicher violated Plaintiff's Fourth Amendment right by allowing Kane to bite Plaintiff for longer than reasonably necessary.  (Doc. 1 at ¶¶ 149–154.)  "[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen," but only when they have a "realistic opportunity to intercede." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (citation and internal quotation marks omitted.)  In the context of interceding a police dog, the Ninth Circuit has determined that officers "who are not canine handlers, cannot be held liable for fleeting acts which they did not commit, came without warning, and could not have prevented." *Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022).  In *Hughes*, the defendants "piled on top of [the plaintiff] while [the police dog] continued to bite" and allowed the dog to bite the plaintiff for over two minutes, even after he had been

---

[5] Plaintiff alleges a failure to intercede claim in his complaint (Doc. 1 at ¶¶ 129–154) but analyzes the officers' conduct under the integral participation theory in his opposition brief to Defendants' motion for summary judgment.  (Doc. 43 at 27–29.)  The Court notes that the failure to intervene and integral participant theories are two separate though overlapping bases upon which a plaintiff can bring an excessive force claim.  Because Plaintiff did not raise the integral participant theory in his complaint, the Court declines to review those arguments on the merits at summary judgment.

handcuffed. *Id.* at 1217.  Despite the defendants' proximity to the alleged misconduct, the Court found defendants did not violate their duty to intercede because "those acts took place during the rapidly unfolding chaos of the physical struggle to apprehend Hughes." *Id.* at 1223.

The Restraining Officers are not trained canine handlers and, unlike the officers in *Hughes*, were preoccupied with securing Plaintiff's body for the duration of Kane's bite.  The Restraining Officers did not know how long Officer Schleicher would allow Kane to bite Plaintiff and they would not have been able to intervene without compromising their ability to place Plaintiff into custody.  Accordingly, the Restraining Officers did not have a realistic opportunity to intercede and Plaintiff's excessive force claim against them fails as a matter of law.

### C.  Municipal Liability (Claim Three)

Because the Court finds that summary judgment is granted as to the induvial defendants, the *Monell* claim cannot succeed, and summary judgment is **GRANTED** to the City of Bakersfield as to Claim Three. Even if the Court did not grant summary judgment to the individuals, the Curt would grant summary judgment to the City, for the reasons set forth below.

Plaintiff alleges the City is subject to municipal liability under the *Monell* doctrine for (1) having a longstanding practice and custom of condoning excessive force, (2) failing to discipline Defendants Schleicher and Sims for prior instances of excessive force, (3) failing to investigate the use of excessive force, (4) retaining officers who it knows have dangerous propensities for abusing their authority and mistreating citizens, and (5) maintaining policies and procedures to not investigate or discipline officers use of excessive force. (Docs. 1 at ¶¶ 176–88; 43 at 32.)

To establish municipal liability under *Monell*, Plaintiff must prove: "(1) that [he] possessed a constitutional right of which [he] was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citation omitted.)  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citations omitted.)  The Ninth Circuit recognizes four theories that establish

municipal liability under *Monell*: "(1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019).

"Absent a formal government policy, [Plaintiff] must show a longstanding practice or custom which constitutes the standard operating procedure of the local government entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (citation and internal quotation marks omitted.) "The custom must be so persistent and widespread that it constitutes a permanent and well settled city policy." *Id.* (citation and internal quotation marks omitted.) "When one must resort to inference, conjecture and speculation to explain events, the challenged practice is not of sufficient duration, frequency and consistency to constitute an actionable policy or custom." *Id.* at 920; *see also Davis v. City of Ellensburg*, 869 F.2d 1230, 1233 (9th Cir. 1989) ("A plaintiff cannot prove the existence of a municipal policy or custom based solely on the occurrence of a single incident of unconstitutional action by a non-policymaking employee.")

"A policy of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (citation omitted.) In such cases, the plaintiff must show "that this policy amounts to deliberate indifference to the plaintiff's constitutional right, and that policy caused the violation, in the sense that the municipality could have prevented the violation with an appropriate policy." *Id.* (internal citations and quotation marks omitted.) Furthermore, "evidence of inaction—specifically, failure to investigate and discipline employees in the face of widespread constitutional violations—can support an inference that an unconstitutional custom or practice has been unofficially adopted by a municipality." *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1234 n.8 (9th Cir. 2011). Inferences can arise from "[e]vidence of identical incidents to that alleged by the plaintiff," which may "establish that a municipality was put on notice of its agents' unconstitutional actions." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1027 (9th Cir. 2015).

It is undisputed that Internal Affairs investigated the alleged excessive force and maintains policies and procedures to regularly investigate allegations of police misconduct. (Doc. 40-13 at 2, 5–8.) Indeed, the plaintiff points to no particular policy, which he contends gives rise to the

27

harm alleged in his complaint. Rather, Plaintiff seems to allege that an unconstitutional custom of the entity caused the harm.

Plaintiff points to a lawsuit filed by another person related to the use of the same K9 by Officer Schleicher. (Doc. 43-3 at 1120-1125) The facts of this other case bear little relation to those before the Court such to put the City on notice of misconduct. Instead, *Bongiovanni v. City of Bakersfield*, BCV-20-102476 TSC are remarkably like those of *Lowry* detailed above, at least according to Mr. Bongiovanni's mandatory settlement conference statement. According to the statement, the upstairs neighbor heard a loud noise. (Doc. 43-3 at 1121) She went downstairs to Mr. Bongiovanni's apartment and saw that Bongiovanni's front door appeared to have been kicked open. (*Id.*) The neighbor called police and Officer Schleicher and his K9 were dispatched. (*Id.*) When they arrived, Schleicher announce his presence and warned that the K9 would be deployed. (*Id.*) When there was no response, Schleicher deployed the dog who found Bongiovanni and bit him. (*Id.*) Bongiovanni tried to remove the dog from the bite, and Schleicher did not remove the dog until after he placed Bongiovanni into handcuffs. (*Id.*) As noted above, upon similar facts, the Ninth Circuit Court of Appeals determined that liability could not be imposed on the officers. The Court held, "From the perspective of a reasonable officer on the scene, the type and amount of force inflicted was moderate, the City had a strong interest in using the force, and the degree of force used was commensurate with the City's interest in the use of that force. The force used was not excessive and did not violate the Fourth Amendment." *Lowry*, 858 F.3d at 1260.

Plaintiff provides copies of two complaints made by arrestees based upon the use of the K9 by Schleicher. (Doc. 43-3 at 1129-1145) These events occurred after the incident with Plaintiff, so there is no showing how they could have demonstrated an unconstitutional custom at the time of the events in this case. Plaintiff also points to two other uses of force by Schleicher. (Doc. 43-3 at 1127) One occurred on August 14, 2020, and the other on October 1, 2020. (*Id.*) He provides no details about these events, so the Court cannot evaluate how or if they bear on municipal liability. Indeed, the outcome of the investigation of these uses of force were not yet finalized. (*Id.*)

28

There is no evidence of prior similar incidents or constitutional violations by Sergeant Sims that would put the City on notice of his alleged unconstitutional actions.  Thus, Plaintiff's municipal liability claim rests on his allegation that the City "failed to properly train Schleicher and Kane and ratified their excessive force by failing to investigate and remedy previous complaints." (Doc. 43 at 33.)  Even assuming Schleicher was not properly trained and somehow Sims had a role in this training failure, to establish municipal liability, Plaintiff must provide evidence demonstrating a "program-wide inadequacy in training." *Blankenhorn v. City of Orange*, 485 F.3d 463, 485 (9th Cir. 2007) (citation omitted.)  "[E]vidence of the failure to train a single officer is insufficient to establish a municipality's deliberate policy." *Id.* at 484.  Thus, Plaintiff is unable to establish that the City was deliberately indifferent to his constitutional rights, and his municipal liability claim fails as a matter of law.

## VI.   CONCLUSION

For the reasons explained above, the Court:

1. **OVERRULES** Plaintiff's evidentiary objections and **OVERRULES** in **PART** and **SUSTAINS** in **PART** Defendants' evidentiary objections.  (Docs. 43-1, 43-4, 43-4, 43-5, 43-6, 43-7, 43-8, 43-9, 43-10, 48; Doc. 50.)

2. **GRANTS** Defendants' motion for summary judgment on Plaintiff's excessive force claim (Claim One).

3. **GRANTS** Defendants' motion for summary judgment on Plaintiff's failure to intercede claim (Claim Two).

4. **GRANTS** Defendants' motion for summary judgment on Plaintiff's municipal liability claim (Claim Three).

5. The Clerk of Court is directed to enter judgment in favor the defendants and against the plaintiff and to close this case.

IT IS SO ORDERED.

Dated:   **May 15, 2026**

UNITED STATES DISTRICT JUDGE